Our next case for argument is 23-1682, Bullshine Distillery v. Sazerac Brands. Mr. Horvath, please proceed. Good morning. Thank you for your support. My name is John Horvath. I'm here for Bullshine Distillery. We're here because the board, in our judgment, applied clearly the incorrect legal standard to the facts of this particular genericness case. This case concerns flavors for consumable goods, just like the A.J. Canfield case involved chocolate fudge for diet sodas. It also includes types of drinks, specifically a drink that is trying to replicate a fireball candy, just like the court addressed at zero. The question of whether something generic is a question of fact, what is the legal standard? Exactly where, in the board's opinion, did they articulate the incorrect legal standard? They articulated the correct standard in a footnote and then ignored it throughout. Specifically, they did find that fireball denotes a spicy cinnamon candy-like taste, a fact established elsewhere in the record that a poser, Sazerac, does not seriously dispute. That's an A48. Similarly, there's a finding that the poser admitted fireball candy and its whiskey have the same flavoring. That's an A28. Then they go on at A60 and talk about how the flavor or taste has been known to many customers who have tried the candy since before a poser started selling fireball candy. It is a desired flavor, as evidenced by the number of recipes attempting to mimic it. That's an A60. They did do the same type of fact-finding for the type of drink. For example, at A22 and 38, they note that the poser unequivocally admitted the fireball name is the generic name for a type of cinnamon-flavored alcoholic beverage and thus is not protectable as a trademark. They made findings which under the law demand... At least they admitted in the earlier proceeding, not admitted here. Sorry, yes. In the federal proceeding, in an answer, they had admitted that when they were on the other side. The board here made that finding and said it was unequivocal and direct evidence of genericness. Despite those findings which demand under the law a generic finding, they did two things wrong. First, they applied an evolving standard. They looked at the question over time, over 20 years. They looked at a period of 2001 to 2004, 2008, and then at the time of trial. However, the law requires the board to look at the question at the time the trademark or the mark is attempted to be used in commerce for the first time. Because that's the time where if it's generic as a flavor or a type of drink, nothing that they can do thereafter can change that result. Is that an assertion? I guess I can imagine that that's an assertion, a legal assertion. Are you asserting that it is just not possible as a matter of fact about the world that something, some expression can be generic at time one and 10 years later no longer be generic? I think the law precludes subsequent use, advertising, promotion, acquisition of secondary meaning or association from ever changing the result of genericness at the time of first adoption. Why? Because the law, well, first of all, Weiss noodle says that. The predecessor court to this court in 1961 dealt with an interesting case, and if I may, Haluska noodles, Hungarian name apparently for egg noodles. It talks about how it was undisputed the registrant there was the first party ever to bring that product to bear in the United States. It engaged in extensive marketing to do so. Consumers began, because of its success and popularity, to associate that name with the provider, the one and only provider. It was wildly successful, and others attempted to copy. This court said all of that cannot be given weight. It cannot convert a generic term into a subject for trademark protection, and the law will not give it any. What was the procedural context of that case? Was it a cancellation proceeding? It was not a cancellation proceeding. And that's at least an interesting statutory issue about that. I agree, and we can talk about that. But to the question of whether what we bring to bear here is a question of fact or a question of law, it's a question of law. It's the legal framework which precludes the board from taking into account any of the evidence that I outlined and which they credited. So they credited here significant advertising. There is no dispute that they engaged in significant advertising after they adopted the mark in 2007. They claimed wild success. We didn't dispute that. It seems so. They point to media recognition and the like. It seems so. The law, though, precludes that from making a difference. Once they decide it's a flavor, which they did, undisputed in this record, once they decide it's a drink. When you say once they decide it's a flavor, where did they decide that? That it's a flavor? Where did they decide it's generic? They didn't. They made findings which demanded a generic misfinding, and I outlined them. But then they turned around and used the evolutionary standard that they've applied over time, say advertising, promotion, success, changes the result. And that's what's legally wrong. I don't think they said it changes the result. Where did they say it changes the result? I think they balanced all of those factors in coming to a conclusion which they said was very close and very difficult about whether this is, in fact, generic. I mean, I don't think I've ever seen the board be as balanced as they were in this case in terms of, boy, this is a really close one. Your reading of it is correct. They were balanced. They made fact-finding. They compared this and that and offset this with something else. But that's not the legal standard that they had to apply, in which in Broad Crown it was outlined, and in Weissnudel it was begun, 1961 to 2018. The law in this circuit and all other circuits is absolutely consistent. The board didn't cite a case that supports a balancing approach. My learning colleagues here don't cite a case. I don't understand. Whether something is generic is a question of fact, and they're trying to figure out, is this generic or is it not generic? And at what point in time, which is another question, but at what point in time, it seems to me that assessing whether it's generic does require taking all these things into account. I mean, if there had already been a determination it's generic, and that's the posture, I think, of the Frito-Lay and the Weiss case, there had already been determinations of genericness, weren't there? No. No. So in the Weissnudel case, there was not. It was concluded that it was not generic below because of all of the things I outlined, the success and the promotion and the association. But here, this court said very clearly, that does not matter. It doesn't matter because it was generic. That's the point being, it's already generic, and what you're telling me I should read the Weiss case for, I think, is the proposition that you can't pull a mark out of genericide. I think. Not genericide, but genericness. Okay. Okay, yes. Okay, from genericness. Yes. But here, they're trying to figure out whether it is generic or not. And I don't know why all of this evidence can't be considered in that context. Because, again, respectfully, I believe the law precludes that. They made findings of flavor and type of drink from the bartending books. And then after adoption, they looked at the period from 2007 to the present and said things like, on the other hand, we recognize that a poser asserted that Fireball is generic over 21 years ago. About a decade before Fireball Whiskey's popularity started to meteorize. But that was just an assertion. That wasn't a finding. There was no finding of genericness. So there was an assertion. I grant you, there was an assertion. In fact, in a litigation way back when, they're the ones, Saranac are the ones that asserted it. I get all that. I'm not oblivious to your argument. But there was no finding that this was, in fact, generic. And so the PTO, or the TTAP, is looking at it in the first instance and saying, is it generic or not? And respectfully, I think they are looking at whether it's generic at the time that you're raising these issues or at the time it was filed or at the time. What is the timing? What is the timing at which you think they should be assessing whether it's generic? So the chronology, I believe, is undisputed. They bought Dr. McGillicuddy's Fireball, McGillicuddy's with an apostrophe S, in 1999. From Seagram. From Seagram. Yep, Seagram. In 2001, they began promoting and selling Dr. McGillicuddy's Fireball in the United States. They applied for the trademark for Dr. McGillicuddy's Fireball because, according to them, that's the brand they bought. In the application for that, they had to disavow that because the examiner determined that Fireball... They had to disclaim the Fireball piece. Yes. So Fireball piece, apart from the entire mark, because it was a drink, a known drink. So they continued to sell Dr. McGillicuddy's with Fireball disclaimed until 2007, and they dropped Dr. McGillicuddy's and began selling Fireball alone. So to your question, that's the time. I still have an answer to your question, though. What is the time at which, from a legal standpoint, one should be assessing whether a mark is or is not generic? At what precise point in time? Are you saying it's when it's used in commerce? Are you saying it's when the mark is sought for registration? Are you saying it is when a cancellation proceeding is brought? What is the precise moment in time that you believe the genericness evaluation ought to take place? The first time they use it in commerce. Usually that coincides with registration, but it doesn't have to. It's not the claimed first use, but it's the proven first use.  What authority do you have to suggest that that is the time in which genericness should be assessed under a cancellation proceeding? The standard requires that timing, because it asks the question. What law? Point me to the law. Point me to whatever it is. It's Weissnudel to Royal Crown. It's the entire body of law, which asks the question, is the mark? Is there any language in the statute that helps on the timing question? I didn't find any, Your Honor. I think it's just the nature of the framework that this Court has adopted. No court that I've found has asked what the critical date, Your Honor, is. I know, I know, but I've got to be telling you. I think the statute does give us some indication, right? Because a cancellation proceeding under 2094 can be brought in order to see cancellation of a mark at any time if the registered mark becomes generic. So if Congress clearly contemplated that a mark could be or not be generic at a given time, why wouldn't the time of the cancellation proceeding be the time at which you measure whether the mark is, in fact, generic? So this statute is broad enough to encompass two types of genericness cases. The one we have here, where it's generic at the time of first use. That can't be changed according to what I believe the law says. And there are generic side cases where there's a coined term from the very beginning. And over time, it becomes so popular that the consuming public begins to associate the name of that, the trademark name, not with the source, but the good itself. Aspirin, elevator, arguably Lego. Those cases, you look at the time of trial. This is a question of first impression, as far as I'm concerned. I know that you think it's already been decided. I don't think it's already been decided. And from my perspective, I think about what is the point of trademark law and the Lanham Act, and it's to prevent deception for the most part. So that's why at any time, if something becomes generic, you can go after it, so that a trademark can be canceled, because there'll be misdescriptiveness. There'll be misassociation in the eyes of the public otherwise. And I just don't see how that, which is the primary goal underlying the Lanham Act, is consistent with your notion that if something was generic in the 1800s, and then today, let me just tell you, none of my law clerks have ever heard of fireball candy, the atomic fireball. But you know what? We have. Me too. You know what they've all heard of? The shots. Yes. Right? I agree. So all those little kids up there know when we said fireball, they're like, oh my God, yeah, the shots. I agree. And you know what? Not one of them thought cinnamon flavor, except for the fact that the shots are cinnamon flavor.  So like they didn't. So why, in light of the notions behind the trademark law, which are what do people associate with this name and how do we prevent deceptiveness, I'm struggling with your argument that once generic, generic for all time, because times change. I'm going to give you time. I'm going to restore your rebuttal time. Okay? Don't worry. It's an interesting case. So it is. Two things, okay? One is I agree that one of the principal purposes of the Lanham Act is to prevent misrepresentation or deception, right? The other important one is to protect competition and consumer choice. So, for example, in the A.J. Canfield case, chocolate fudge for diet soda, the court there said, hey, there are important competitive issues here because one provider of diet soda cannot monopolize chocolate fudge. All providers need to be able to do it because it's the essence, the key aspect, it's the flavor of it. The timing question seems to be, at least as I'm thinking about it as you're talking, focused on the scenario, which I don't think we've quite seen an example of before, but that I think the board effectively found here, which is that there was a period, say, from 2001 or 1955 or whenever atomic fireball came on the market, when everybody, when it was clearly, when the flavor was clearly named this, so it was generic as to the flavor. But by the time anybody here litigated the issue, let's assume that at that time, it's no longer viewed as the name of the flavor. And the question of which time period counts, I think, where the rubber meets the road is in a scenario. And I know you dispute the facts about that. But assuming that the board could reasonably find that today this word is not generic as to the flavor, why isn't that enough to say, well, at this point, there's no Lanham Act purpose to be served by taking it away from them? So your scenario assumes that I'm wrong about Weiss noodle in all the cases that we cited, which preclude advertising promotion and success from changing. I'm interested in what the argument is about why an action that is being requested to take place now shouldn't take place, even if now there's not a generic character. So in generic side cases, which this is not, it should be at the time of trial. You look back and did it go over the edge? Did people say, oh, it's so popular? Because it's generic now. Yes, I agree. The statutory scheme of the Lanham Act, not just the cancellation of registration, which you quoted, but the overall scheme says that a generic term is not entitled to registration. And so you look at the time it's being first used to determine whether it's generic or distinctive or something else. Right, but then the, what is it, section 14 that the chief referred to before. 1064. By using, I'm happy to call it 1064, whatever. It's section 14 of the Lanham Act codified at 1064. The use of the word becomes maybe does say that if the issue doesn't get litigated until some later period, it's that point at which the registration is being challenged that counts. Right. And two things. Registered mark is defined in the Lanham Act to mean the mark that is registered. So here that's fireball. So it's not the time of registration. It's the word that's being used in commerce. I understand. I think I understand that there is an argument. I mean, none of this has been fleshed out that actually you could challenge the mark status. Notice I did not use the term registration of fireball term here, which is the premise of their opposition to your registration, that you might be able to challenge that without effectuating a cancellation because 1064 might not authorize the cancellation. All right. So that issue was not argued below. It was not passed upon below. And it could be why we're struggling with it here in the first instance. And so passing on it here is the wrong thing to do. But I would say a few things. One, no court has ever said 1064 is focused and only allows a finding of cancellation for genericity when you look back. All right. But, I mean, I guess in looking at this statutory question, are you familiar with the 1961 case of the CCBA, Bart Schwartz International Textiles? I have not. I think that says it might be dicta, but maybe not. It says we're going to rule for the Federal Trade Commission, which was the plaintiff there attacking something, on a ground of fraud. So we don't have to get to the second ground. But the second ground was that based on the alleged descriptiveness there of the mark, but has not been considered for, it does not state a ground for, and descriptiveness at that point was actually called, that's what generic was called then, right, had not been considered for, it does not state a ground for cancellation, which can be asserted by the Federal Trade Commission in a cancellation under the language of Section 14. They're talking about becomes. And we know that because in the months that followed, the FTC went to Congress and said, can you change this language, please? And Congress said, we're not sure, but we're not going to do it now. This was actually an issue flagged, what, 60 years ago? Not flagged in this case below. Flagged for the first time in the opposition brief here. I will also say the case cited by my learned opponent is Pennington. It's called Pennington, and it dealt with the trademark rebel for grass seed. And the court there held that because rebel was known at the time of first adoption to be a type of grass seed with various characteristics, it was then and will always be generic. So, you know, the case that they support for their proposition that becomes is limited to generic side is actually a non-generic side case that supports the notion that here it's the time of first adoption. And it's the entire statutory scheme. And, again, it hasn't been fleshed out because it hasn't been raised properly. But challenges to trademarks on certain grounds, they end at five years, right? Certain of them never end. If it's generic, that never ends. Fraud, that never ends. And so if you look, and a registration is never allowed for a term that's generic in the first instance. And so it would be an odd result, for sure, if the cancellation of registration statute cut out the ability to challenge something that should never have been registered in the first instance. Okay, I think we have your argument. At this point, we need to hear from the government. Thank you, Your Honor. Oh, we don't have the government. Not the government, sorry. Ms. Degnan, please proceed. May it please the Court. Lauren Degnan for Sazerac. So I thought I would start kind of reframing the issue here. I think the questions highlight that the issue of the Board's decision on genericness is a question of fact. The Board made a factual finding that Holstein had not proved genericness. That factual finding is supported by substantial evidence, and that can be the end of the question. Because the evidence supports the finding. Well, I don't think that can be the end of the question, because I think his argument is that they only reach that conclusion by considering evidence that they're prohibited from considering as part of that very question. So I don't think that that's the end of the question. I don't know if you just heard the last 25 minutes, but most of it was spent on at what time, because that determines what pieces of evidence the Board is allowed to take into account and not take into account. Absolutely. So to answer your question, Judge Moore, the Board looked at a long period of time. It looked at the time of registration, and it looked at the time of trial, because it was addressing both those time periods. And so it did an analysis that looked at a variety of evidence. But with respect to the finding of non-genericness, we can look at the evidence of the appropriate time period and see that there is substantial evidence to support the finding. Again, I think the appropriate time period is the question. I'm happy to talk about the appropriate time period. And I think your question, Judge Toronto, is a good one. If we're going to look at the statute, the statute does talk about… I think there's a very, very strong argument that this contention was actually forfeited about the availability of the statute, particularly because I think it's kind of complicated to figure out what the right statutory interpretation is. But just on the question, which I think the Chief initially brought up, what does this statutory language indicate about the timing at which genericness counts? Genericness or not counts. So I would agree that the statute, when it talks about becomes generic, it would be looking at the time, frankly, at any time up until the trial time. It had to become generic. And that assumes it was not generic ab initio because, again, you have to transition from something that was not generic to something that becomes generic under the statute. But if we want to focus in on the relevant time frame, if we're going to discuss, as in Chippendales, it was the time of registration that include for the 432 registration. It was filed in 2001 and issued in 2004. Chippendales tells us we would look at that time period, obviously before. That would be relevant for the 432 registration. And the evidence in that time period includes the board's finding that the word fireball was known for trademark use, more than non-trademark use, based on registrations for the atomic fireball, based on use by Sazerac for Dr. McGillicuddy's fireball whiskey shooter. That is evidence in the 2001 time frame. The board found that that was used in commerce of the fireball mark by Sazerac's predecessor. And that use is supported by the press release and the label that shows use of fireball. So that is substantial evidence that it was not generic because the board found it was being used in commerce. The board also looked at recipes. Let me just understand the facts. Sazerac did not use fireball in a mark way until it dropped Dr. McGillicuddy's in 2007. Because when you registered Dr. McGillicuddy's fireball, you actually disclaimed the mark status of the fireball. So you're talking about the period of use before you acquired the, whatever the company was that you sued, saying you're not supposed to be doing this. So let me clarify the facts.  Sazerac did use, through Seagram's, it's an acquisition of Seagram's, fireball as a mark. The disclaimer you're referring to for Dr. McGillicuddy's... I'm sorry, you used it standing alone? Yes, we did. If you look at the label on Appendix A642... Where's the factual finding on that? The factual finding... I'm sorry, the fact that it's on the label does not establish that it's being used as a mark. You put all kinds of descriptive stuff on the label. Okay, so the board did find that that was used in commerce and it cited the label as evidence of use. But to point to additional evidence, after the disclaimer in 2004, Sazerac attempted to withdraw the disclaimer and it filed a new mark for... What was the name of the predecessor? Mohawk? Mohawk is not... Mohawk... Mohawk was their brand, but there was another name for the company, also beginning with Mohawk. Yes, Marie Broussard was the litigation that was involved. Did that company use Fireball alone clearly as a mark? The record shows that there were registrations and evidence of pictures of how they were using the mark. The record doesn't have sales data by that company. It has sales data of our company selling the Dr. McGillicuddy's Fireball whiskey. Just to go through this disclaimer. In 2004, Sazerac attempted to withdraw the disclaimer, was denied, and then filed another registration for exactly the same word mark, Dr. McGillicuddy's Fireball. There was no disclaimer in that registration. That was in 2004. There was no suggestion. Not only was there no disclaimer of that second registration, there was no rejection under descriptiveness either. We take issue with any finding that this court might make, contrary to the board's finding, that there was no trademark use by our client before 2007. It was being used in 2001. It was continued the entire time from 2001 through 2004, continued on up through 2007 with the rebranding. Even though with all of that, including the 2004 registration, you're still not using it alone. You're still using it with Dr. McGillicuddy's. It is used on the bottle. It would be like Xerox's photocopier. If you look at the imaging and the way it was being used, Fireball is displayed prominently. Again, the board made a finding that we were using it as a trademark. That finding is subject to... Where exactly is that finding? That finding is Appendix 22 through 23. Where is that? 22 through 23. It talks about the press release that we gave. Let me find it. The press release is... On page 23, isn't it? Yes, thank you. That's right. Here, the board says, at the same time it was using Fireball as a moire for its cinnamon whiskey product and using cinnamon whiskey to identify the product's category, as shown in the press release shown on Appendix 23. That is a finding by the board. It is supported by substantial evidence by both the press release as well as the label that the board cited. You can see it on page 24 on the next page. The press release is the language, Sazerac Company will introduce Fireball cinnamon whiskey and the newest member of the McGillicuddy family. Doesn't it immediately start talking about Dr. McGillicuddy's Fireball? It talks about that it's part of a family of other drinks. Excuse me? That seems rather weak support for an idea that it was actually using, as a mark, stand-alone Fireball at the time. Well, Your Honor, I think when you look at the imaging, Fireball is prominently displayed. And again, we're not looking... The substantial evidence test, with all due respect, is not a particularly high burden, and both of these things count. In addition, there's evidence the board... What is this fact-finding? Doesn't the final sentence say, based on the record in its entirety, during the early 2000s, opposers did not consistently treat or use Fireball as a mark? Well, it does say they didn't consistently do it. If there's a fact-finding, it doesn't seem to help you. I don't understand. Well, in addition to the... What am I missing? Well, it says that it was using it as a mark. And, you know, it wasn't consistently using it as a mark, is part of the evidence, but it's still a finding it was using it as a mark. Where does it say it was using it as a mark? On page 22, Your Honor. It was using Fireball as a mark for its cinnamon risky product. On the previous page. That last sentence on 22. And then the pictures of the bottles come from 2007, right? So, the picture on page 24, it shows the rebranding from 2007, but I would direct the court to the attention of appendix 642, which reproduces exactly the same picture on the left-hand side of that picture there. And from, you know, 642 is... I'm sorry, the picture is reproduced at appendix 639, showing U.S. sales of 2001. At 639. And then the board also mentions that, in this time frame, Sazerac's product enjoyed modest success. It says modest success in the first several years of offering, the product. And that's at appendix 24, is the finding. And the support is appendix 640 at paragraph 13. So this is evidence of use in commerce on a product that shows it was trademarked used in 2001. As early as 2001. And it continued onward. Okay, so we can... I think substantial evidence supports the finding. We have to accept that it was being used in commerce by our client as of 2001. And as a result, that was an appropriate time frame for it to be. It was the time when the mark was being registered, the 432 mark. And it was continued in use through 2004. Again, we had this issue with disclaimer, and we called it a disclaimer in 2004. And it continued on all the way up through 2008, when we had the second registration. You're spending a lot of time on this. I guess I don't understand. Why are you... You're really wanting us to conclude that it was used in 2001, not 2007. What substantial impact does that have on this case? The impact is, Your Honor, that it was not generic ab initio in 2001. The Board made a finding that... And that's finding supported by substantial evidence. It was not generic in 2001. The Board also made a finding it was not generic in 2008, taking into consideration all the evidence prior to 2008 with respect to the second registration. And so, in this entire time period, if we're looking at the period of time of the registration, the Board made findings saying it's not generic. And those findings supported by substantial evidence. We can continue on through the time of trial, as the Board also found, and the evidence only gets better that it was not generic. Because the evidence on which they rely predominantly are these recipes. These recipes have never been consistent. And most of the recipes were talked about in terms of books that were not directed at the relevant consuming public. These recipe books are dealt directly with bartenders, not the public, the consuming public, which is consumers of whiskey and liquor. And so, at any relevant time, the Board was very thorough looking at all the time periods available to it. And at every possible moment, it found that the mark was not generic. And those findings are supported by substantial evidence. And so, that part of the decision should be affirmed. So, just to be clear, you're saying that the times of registration, that the appropriate times, is it moment of registration and the time of trial? That's when you look at... We think yes. We think that the law is clear, that if you're talking about... So, all those other pictures that you were showing us, that doesn't matter, does it? Well, I think this is in 2007, and one of the registrations was filed in 2008. It's certainly relevant to look at that time period. That's evidence that tends to prove a fact in 2008, because it's close in time to the 2008 time period. Well, that kind of confuses the issue. Now you're talking about relevancy. Is two years out, three years out, is that relevant? To answer your question very precisely, I think, under Chippendales, we look for ab initio genericness at the time of registration, and Chippendales explains it can be at the time of filing through issuance of the registration. And that's what 1604 says. That's what the statute says, 1604. 1064. 1064 says it becomes generic, so that would be a generic side scenario, and that would be at the time you would look at any period of time, up until the time of trial, whether it became generic. And again, the board looked at that entire period of time. I'm not quite sure I understood what you said. Did you just say that, in fact, the right time to look at this is the time of registration, not today? I think because they've argued that this is not a generic side case. There are three periods, three possible periods, right? Way back before this registration, the registration, and then today. Do you think that the right time is the registration time, which is neither the earlier nor today? Our position is this, Your Honor. For a generic ab initio, from the beginning, as the time of registration, that is the time. For a generic side, it would be the time of trial. And you can look at the period, any period coming up to the time of trial. How do you challenge generic ab initio? Under what statutory section? So our position is, Your Honor, is that Latinx 1064 does not allow that. And I appreciate your point that that issue was not fully vetted below. But our position is that, under the statute, it says becomes generic, you cannot charge it ab initio. So I don't understand. When is it you think generic ab initio, as you call it, should be challenged? At the time of registration, Your Honor. That is the time we think it's well, and we rely on the Chippendale case for support. Because if you're just saying that this registration should not have issued initially, you would look at the time of registration. As of that time, is that mark generic? And under what statutory provision? Under what statutory provision is that challenge being made? I think that would be the, I don't have the statute, Your Honor, but it's the statute that allows you to register in the first instance. 1051? 1051, maybe? I think so. Why don't you look it up? Why don't you look it up and help her? There we go. And this was a case law. What periods of time did the Board look at evidence for? The Board was very thorough. So in making its findings with respect to the time of registration, it reached back in time and looked at the evidence of record, all the evidence before it. Up to the time of registration. Up until the time of registration. Did it look at evidence, I guess, for the last 16 years? Post-registration until last Saturday night? Well, remember, there's one from 2001 and one from 2008. So it looks at that evidence. And so for the time of registration, our answer is no. It did look at evidence after the time of registration with respect to up until the time of trial because it also made findings as of the time of trial. But it's got two sections in its report. So what relevance are those findings up to the time of trial to the cancellation issue, putting aside your statutory point that cancellation's not available for something that started out generically? All right, so I have two responses to that. First, they don't challenge the findings with respect to the time of trial. So that's weak. Well, they say that under Weiss and other cases, it's legally irrelevant. Okay, so you wouldn't expect them to challenge it, right? What is the relevance of that? What did the board rely on those for? And why are they relevant under your view that the relevant time is the time of registration, not anything since in the last 16 years? The board relied on them because in terms of the evidence presented to it and the arguments that were being made to it, it wasn't entirely clear that this wasn't a genericized case. So it was okay for the board to rely on that evidence for its finding as of the time of trial. To affirm under our view, which is the time of registrations, you don't have to look at that evidence at all because there's substantial evidence at the time of registration that the mark was not, was used as a mark. The evidence is not showing that the name is a common name, common generic name for a good. The board made the contrary finding that it was not generic. And so if you look at the evidence from that time frame, that evidence supports the finding. So under our theory, when we're only looking at ab initio at the time of the registrations, the fact that the board did a very thorough job in making findings at the time of trial is good for the board, but we can focus on the time of the registrations and still affirm and should affirm because of the evidence that supports the findings in that time period. I'm way over my time, Your Honor. I would like to talk about the cross appeal, but I want to answer the questions you have. You've just completely confused me, though. I don't, I don't. So let me just ask you something. Are you, is it your view that a mark could be registered, not be generic at the time, or be generic at the time it's registered, later on not be generic at the time it's challenged and the challenge should lose? Okay, so then this hypothetical, which again is not our facts given the findings we have, but in the hypothetical that the TTAB makes a mistake and it registers a generic mark. And then it's challenged later under the statute saying it had to have become generic. And in the later time period, it in fact is not generic, and the evidence is undisputed. In that hypothetical, we actually think that would be okay. I don't even think that that, you think what would be okay? We think that it would be too late to challenge because you're after the five years. You can only challenge becomes generic. And if it hadn't become generic after its initial registration, then you wouldn't be able to cancel it. In your hypothetical, where there was a mistake that was made initially. But it doesn't even have to be a mistake that was made because you could have somebody who doesn't register the mark during the period of time in which it is in fact generic and then seeks to register it at some later date when they believe through their own use it's acquired sufficient secondary meaning that it is no longer generic. That now the consumer public perceives it as a source identifier, even if they didn't initially, right? Right. Is that a set of facts that could exist? That is a set of facts that could exist. And to answer that, I think what this court has said in cases that bind all of us in this room is that you can't take a mark, a word that is generic and transform it into a trademark through secondary meaning. That's what this court has said and we're not, of course this panel can't overturn that law. So under that law, you can never take a generic word out of the, and use it as a trademark. It cannot acquire secondary meaning. Now that law I think, from a policy perspective, is questionable because we do know, especially from Chippendales, that marks do evolve over time. They can become stronger and they can become weaker. Words have different meaning over time. And I think your question sort of suggested that, that sort of tension is that the law is clear that marks can go up and down over time. But given the law that this court has set forth in its cases saying you can never remove, once it's generic, it's always going to be generic, I think under your scenario we run into the statutory issue, but if you put that aside, we generally agree that this court has said that you can't sort of rescue a generic word and turn it into a trademark regardless of the amount of secondary meaning that has been attributed to it. So you think that Weiss-Noodle case stands for that? No, I can't speak to the Weiss-Noodle case today, Your Honor. I just do know that there are cases that we've seen and cited that this court has said. What cases? I don't have them handy. I apologize for that. So you're saying there's a definitive proposition of law that we can't get around but you don't know any cases for it? Forgive me, Your Honor. I'm just standing here. I don't have the cases on hand. Do you know the cases? No, I think the whole conversation maybe got confused but I'm not a genericist. No. Do you have more questions for me? I'd love to talk about my cross appeal but I want to be respectful of our time. Do you want to deal with cross appeal? Do you need anything? Do you need anything on the cross appeal? No, we're all set. Thank you, Your Honor. It sounds like we may have agreement as to the law. But not as the precise timing. So there's a concession that the law precludes. You do understand there can't be concessions on law, right? You guys can't stipulate to law. I agree. They presented no law contrary to what I've presented to you. That I'll agree with. Thank you. Weissnudel going all the way to Royal Crown and beyond says what I said. The question appears now to be do you time that at the time of first use or registration? What about her argument on the factual findings of the Board? I think that her default is it doesn't matter what the time period was because the Board evaluated everything. Then the Board evaluated just this part. Then the Board evaluated just that part. And no matter what day they were tethering themselves to it was not generic at any one of those precise times. And so that none of the times that you proposed that are the time we should be looking at this for did the Board not already conclude against you on a fact finding. She pointed to two things. First thing was appendix 22 to 23. And there is a notation that Fireball was being used as a mark for cinnamon whiskey. And the support for that is one press release where it says in the very beginning Fireball the newest taste sensation and member of the Dr. McGillicuddy's family. And so it's going back and forth between using it as a trademark and noting that Fireball is a taste. And then the Board notes immediately on the other hand in the same press release Opposer says menthol mint schnapps vanilla schnapps and Fireball are members of the family which could be perceived as equating Fireball with the flavors. Menthol mint vanilla schnapps. And then as your Honor noted the ultimate conclusion is that there's not consistent treatment or use of Fireball. It doesn't have to be consistent. The first thing on page 20 doesn't have to be consistent to be used as a trademark. The first thing she said which seems accurate is the Board's fact finding that it was using Fireball as a mark. At that time. That's on page 22. There's one notation for that? That's not called a notation. That's called a fact finding. The ultimate fact finding is it's inconsistent. No, it's treatment. They didn't say it's inconsistent. They said it didn't consistently treat it as a mark. But I don't think you have to consistently treat it as a mark to claim you've used it as a mark. Immediately thereafter they applied for Dr. McKillicutty's Fireball because according to their corporate representative that was the brand that they bought. And we know the trademark prosecution history on that. They needed to disclaim it and disavow exclusive rights as to it. And in point and fact they only used... But I guess whether it's been used as a mark or not doesn't mean it's generic. I don't understand. How does... Help me connect your arguments. I'm just trying to follow it. I found this case very confusing. How does whether they for sure were using it as a mark or not at this exact time impact whether it was or was not generic at this exact time? From my perspective it only affects the timing. It affects the timing of when the board should have inquired as to whether that name term, whatever you want to call it... Why? That's first use in commerce. That's not even registration. I agree. I don't think it's registration because of your hypothetical, Your Honor. You could sit on... You could be using for a long time a mark in commerce and then acquire... I thought you said you looked at first... Did you say you looked at first commercial use as a time to assess genericness or did you say you look at the date of registration to assess genericness? Our position is first commercial use. Their position now appears to be time of registration. I believe your hypothetical pointed out why it needs to be first use. You could be using in commerce a generic term attempting to acquire trademarks through promotion success and acquiring association contrary to Weissnudel and all the law we've talked about and then later once you succeed file your registration and if it's timed at registration then you've circumvented the law. I believe that this is like an invalidity case for patents. There is a date where you test is it new or non-obvious and it's the date of first use. It's the time you try to take it out of the public domain and take it for yourself. Just out of curiosity, isn't it the case under trademark law that when you apply for a mark it's the date of registration where it's for example distinctiveness is assessed and isn't genericness the spectrum of distinctiveness from suggestive, distinctive, arbitrary, generic and isn't it the case that for all registration purposes that assessment is done the day of registration and not the day of first commercial use? I agree that the work is done after registration. Not the work. Doesn't the law say you assess distinctiveness of which generic is a part under 1061, 1064, whatever it is, don't you do it at the time of registration? Isn't that when the distinctiveness of a mark is considered by the office for purposes of assessing whether to allow it to be registered? No. It's the date of first use and that's why the applicant... Where? What case do you have that says it's date of first use? I believe it's the statute. Again, Your Honor, this is something that was not raised below. Does the 1604 say differently? 1064 talks about at any time. It's okay. Don't worry, I'm doing it too. That one says if at any time. And so here I would apply that to before the popular candy fireball, fireball was something as in the dictionary, falling from the sky. But over time, because of its popularity, the flavor became... I just have one question for you, which is at what time and under what law can I see at what time precisely the board decides or the TTAB decides when someone attempts to register a mark, what is its level of distinctiveness? Because that is critical to its registration and I think it's absolutely positively at the time of registration. And I think that's what the law says. I don't, as I sit here, know what statute to point to. I don't know what case to point to. I'm asking you if you have one that maybe I could look at because you seem to think I'm not right about what I think the law is. I don't have a case because this was not briefed, but I will point to the statutes which I think say it's the time of first use. And it's 15 U.S.C. 1052E 15 U.S.C. 1065E  And Can I just tell you why I think I'm right? I mean, I don't know 100% for sure that I'm right for sure, but the reason I think I'm right is because you can move on that distinctiveness chain as we all recognize under trademark law, right? From the arbitrary to the suggestive to the distinctive to the generic. You can move on it. And you know what makes it move a lot? Secondary meaning. It makes you move. It can change a mark that starts out in one category and move it to the other. Secondary meaning is something you acquire with use. So I'm pretty sure since registration considers distinctiveness and secondary meaning can move you on that timeline of distinctiveness that they've got to be doing it at the time of registration. Can I respectfully say I disagree? No, of course. You don't need to be respectful. Just go for it. So secondary meaning is acquired over time and only affects the category of distinctiveness which does not include inherently distinctive terms. So, for example, if you took fireball before the candy even existed Can you not use fireball, please? Just because if you just I don't know what the right example is then but if it's in the higher categories of distinctiveness secondary meaning never matters.  Well, the only time secondary meaning never matters when you have something truly arbitrary. Right? Right. So I was going to try fireball before the candy because I do think that that would have been suggestive. A bowl of fire is being used to describe a drink. Huh. You'd have to use some creativity to say that must be spicy or hot or something. Let me try that. Not a lot. Really hot. Not a lot of creativity to think that. Some. A lot. I don't know. That's why we use the word hot for a certain taste in the mouth and also for heat from fighting things. But that would just be hot soda as opposed to fireball soda or something. And so I don't think it matters for most categories. And so it needs to be and we always tell the office the date of first use because that's when it's measured. Okay. You know what? I think we're good. You have one more question? Oh my god. You didn't have a chance to get it up. It may not be as central to the disposition of the case as what we've been talking about. But there's a sentence on page 27 of your yellow brief and I wonder if you think in order for you to win we need to endorse this sentence. And the sentence reads, Harvard trains bartenders to service the relevant consuming public. Well I think that's axiomatically true. That's what Harvard does? Well I think that this may be a date. Just to be clear, he is not studying bartending. I'm not sure what. It's an extra amusing sentence. Okay. Thank you, Your Honor. I appreciate it. Okay. I thank all the counsels.